UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA         Crim. No. 3:18CR17 (VAB)

     v.

ERNESTO DELGADO           April 28, 2020

GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR COMPASSIONATE RELEASE

On January 28, 2019, defendant Ernesto Delgado pled guilty to a single count of

conspiracy to distribute, and to possess with intent to distribute, 5 kilograms or more of cocaine

in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846.   In doing so, the defendant

stipulated to an attributable drug quantity of at least 5 kilograms of cocaine but less than 15

kilograms.   The parties and the Probation Office agreed that the defendant was in Criminal

History Category IV and that the defendant's applicable advisory guidelines imprisonment range

was 120-125 months.   On April 25, 2019, the Court sentenced the defendant to the applicable

mandatory minimum 120 months' incarceration to be followed by 5 years' supervised release.

On April 23, 2020, the defendant filed a motion for compassionate release (Doc. No. 68)

in which he seeks to have his sentenced modified to time served or home confinement for the

remainder of his term because he suffers from health conditions that render him particularly

vulnerable to COVID-19.   Alternatively, the defendant seeks a furlough until the COVID-19

crisis is resolved.   Defendant was initially arrested in this matter on December 1, 2017, and to

date, with credit back to the date of his arrest when he was ordered detained, he has served

roughly 29 months of his sentence.   The Bureau of Prisons calculates his anticipated release date

to be June 9, 2026.

For the reasons set forth below, the Government respectfully requests that the Court deny the defendant's motion.

## I.      The Defendant's Offense Conduct

In approximately February 2017, the United States Postal Inspection Service ("USPIS") began profiling USPS Priority Mail parcels mailed from Puerto Rico to the greater Waterbury, Connecticut area.   Further investigation and analysis of USPS business records identified a consistent pattern of related shipments of incoming and outgoing parcels. The incoming parcels consisted primarily of USPS Priority Mail medium flat rate parcels. The parcels weighed approximately six pounds, bore handwritten labels, were purchased in cash, and were dispatched via U.S. Mail, primarily from Aguadilla, Moca, and San Antonio, Puerto Rico to various addresses in Waterbury, Connecticut.   USPIS suspected the packages to contain kilogram quantities of cocaine.   The related outgoing mailings dispatched from Waterbury to Puerto Rico were typically mailed within one to three days of an incoming parcel being mailed from Puerto Rico to Waterbury.   These outgoing mailings also consisted of USPS Priority Mail medium flat rate parcels. The parcels weighed approximately four pounds, bore handwritten labels, were paid for in cash and were dispatched via U.S. Mail from Waterbury, Connecticut to various addresses in the same cities in Puerto Rico.   USPIS suspected that these parcels contained bulk cash as payment for the incoming parcels of cocaine.

In March 2017, the lead USPIS inspector met with the DEA. The DEA had received information that Ernesto Delgado, a Waterbury resident, was receiving bulk cocaine shipments via USPS from Puerto Rico.   USPIS investigation believed Delgado to be connected to their

investigation.   From the investigative activity by DEA, investigators identified Delgado's phone number and vehicle.   Over the next several months, case agents gathered evidence showing that Delgado himself and several others he enlisted, including co-defendants Jose Rivera and David Vangas, were engaged in a conspiracy to ship multi-kilogram quantities of cocaine from Puerto Rico to Waterbury, Connecticut through the United States mail, for re-distribution to drug dealers in the Waterbury area.   At the same time, they would ship hundreds of thousands of dollars of cash from Waterbury to Puerto Rico, which monies represented the proceeds of the cocaine transactions in Connecticut.

On April 28, 2017, after being alerted about a suspect package, USPIS established surveillance in the area of 171 Northridge Drive Waterbury, CT.   Delgado, David Vangas, and another party were observed at this location.   At approximately 2:32p.m., a USPS delivery van pulled into the parking lot of 171 Northridge Drive, and parked in the area of apartment 2.   The postal worker delivered the suspect package, which was mailed from Aguadilla, PR 06603 on April 25, 2017, weighed 6lbs., 5 oz., bore the following sender information: Mishelle Roldan 115 Calle Belt Ramey Aguadilla PR 00603, and the following addressee information: Eric Padilla 171 Northridge Dr. Apt 2 Waterbury, CT 06708.   USPIS personnel observed Delgado leaving the residence soon after in a maroon colored Subaru wagon bearing CT Registration: AH01446. He went to his residence at 932 Highland Ave. Waterbury and then to 33 Vista Place, Waterbury, which was co-defendant Jose Rivera's residence.

On or about May 24, 2017, USPIS identified a suspect package mailed from San Antonio, PR 00690 on May 22, 2017. The parcel bore a USPS Priority Mail label with the following handwritten addressee information: "Miguel Arroyo 1822 Meriden Rd Apt 21

Waterbury, CT 06705" and a return address of "Mishelle Roldan 115 Calle Belt Ramey

Aguadilla, PR 00603," same as the April 28 package described above.   This parcel measured

weighed approximately 6 pounds, 5 ounces. A telephone number associated with the addressee

had frequent communication with a phone number associated with Delgado.   After a trained

narcotics detection dog twice alerted on the package, the agents obtained a search warrant for it

and discovered approximately two kilograms of cocaine, which was confirmed by lab analysis.

Delgado was also captured on USPS surveillance mailing suspected money parcels to

Puerto Rico.   On July 15, 2017, a suspect USPS package was mailed by Delgado (captured on

video in the post office) from the U.S. Post Office in Waterbury, CT.   The parcel was addressed

to Jorge Torres, PO Box 3605, Aguadilla PR 00605, and bore a return address of Marcos

Rodriguez, 22 Sumac St. Apt #2 Waterbury, CT 06704. The parcel was subsequently intercepted

and seized by law enforcement. After obtaining a search warrant, officers found that it contained

$100,000 in cash. A query of USPS business records shows that this package was tracked in

conjunction with the prior USPS parcel seized on May 24, 2017 and found to contain two

kilograms of cocaine.

In mid-July 2017, the identified consistent pattern of incoming and outgoing USPS

Priority Mail parcels began to diminish. At the same time, Victor Acevedo-Vera, a known head

of a cocaine drug trafficking organization in Puerto Rico, was murdered in the Aguadilla, PR

area.   He was the suspected source of cocaine for Delgado.   Prior to Delgado's Facebook

profile being removed from public view, a query of Facebook revealed the profiles of Delgado

and "Vic Acevedo" were associated "friends."

In October 2017, the package deliveries resumed.   On October 28, 2017, USPIS

4

identified a suspect package mailed from the U.S. Post Office in Anasco, PR on October 27, 2017. The parcel was addressed as follows: "To: David Vangas 41 Robbins st 3rd FL Waterbury ct 06708," and bore the following sender information: " From: Anibal Vangas HC-58 – box 13576 BO. Atalaya Aguada P. R. 00602."   The parcel weighed approximately 19 pounds, 14 ounces. USPS business records showed that two other parcels had already been delivered to this address: one on July 13, 2017 weighing 5 pounds, 14 ounces and one on June 6, 2017 weighing 6 pounds, 2 ounces. On October 29, 2017, USPIS established surveillance in the area of 41 Robbins Street, Waterbury and observed David Vangas, as he parked a Honda Accord sedan bearing CT Reg: AF00484 in the driveway of the residence, got out of the vehicle and entered the residence.   On October 30, 2017, surveillance of the same residence observed Vangas and his Honda at the residence, along with Delgado, who was operating a maroon Subaru Outback wagon bearing CT Reg: AH01446. He was with Rivera, who got out of the car and entered Vangas's residence.   On October 30, 2017, after a trained narcotics canine twice alerted to the package addressed to Vangas, officers obtained a search warrant for it and discovered four kilograms of cocaine. On October 31, 2017, surveillance in the area of 41 Robbins Street Waterbury observed a maroon Subaru Outback wagon bearing CT Registration AH01446 drive past the residence, park at 318 Congress Avenue, and then return to drive past the residence again, as if to be waiting on the delivery of the package.

On November 28, 2017, USPIS identified two more suspect packages.   One was addressed to "Krystal Rodriguez 27 Manhan St 1st Floor Waterbury, CT 06710," and bore the following return address: "Pedro Rodriguez 805 Calle Llovera Bo La Romana Quebradillas, PR 00678." It weighed approximately 10 pounds. The second was addressed to "Jazmin A. Gala 136

Jersey St apt 3 Waterbury CT 06706" and bore the following return address: "Carlos Gala HC 05 Box 58114 Hatillo, PR 00659." The parcel weighed approximately 10 pounds 1 ounce.

On December 1, 2017, a controlled delivery was performed on the first parcel, addressed to "136 jersey street apt 3 waterbury."   On the morning of the controlled delivery of the package, officers observed Delgado and Jose Rivera together.   Rivera subsequently arrived at the delivery address with his nephew, who retrieved the parcel, and placed it in Rivera's vehicle. By this time, the agents had obtained federal arrest warrants for both Delgado and Rivera. Agents executed the arrest warrants, seized both packages, and obtained federal search warrants for both packages.   Execution of those warrants revealed that each package contained two kilograms of cocaine.   Delgado drove past the delivery address as Rivera was standing in handcuffs with agents.

In summary, Delgado was the driving force behind a large-scale, multi-kilogram cocaine distribution scheme in Waterbury, Connecticut with a source of supply located in Puerto Rico, which scheme spanned nearly two years.

II.     **The Applicable Law**

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 825 (2010).   As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well- established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence.

Rather, it may do so only pursuant to statutory authorization. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

The First Step Act of 2018 authorizes a defendant to seek a sentence reduction in district court, including compassionate release, when compelling and extraordinary reasons support such a reduction. *See* 18 U.S.C. § 3582(c)(1)(A)(i). Indeed, the defendant here moves for a sentence reduction to time served under 18 U.S.C. § 3582(c)(1),which provides, in pertinent part that:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>> (i) extraordinary and compelling reasons warrant such a reduction; . . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission

18 U.S.C. § 3582(c)(1)(A). "Accordingly, in order to be entitled to relief under the statute, [the defendant] must both meet the exhaustion requirement and demonstrate that 'extraordinary and compelling reasons' warrant a reduction of his sentence." *United States v. McCarthy*, No. 3:17CR230 (JCH), 2020 WL 1698732, at *3 (D. Conn. Apr. 8, 2020).

The relevant Sentencing Commission policy statement is found in U.S.S.G. § 1B1.13. That section provides that the Court may reduce the term of imprisonment if "extraordinary

and compelling reasons warrant the reduction," *id.* § 1B1.13(1)(A); "the Defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3).   Application Note 1 to U.S.S.G. § 1B1.13 enumerates four circumstances that constitute "extraordinary and compelling reasons."   The first addresses the medical condition of the defendant, focusing on whether the defendant suffers from a "terminal illness" or some other condition that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."   The second concerns the age of the defendant, in that the defendant must be "at least 65 years old," "is experiencing a serious deterioration in physical or mental health because of the aging process," and "has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." The third focuses on family circumstances, specifically the "death or incapacitation of the caregiver of the defendant's minor child or minor children" or the "incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." The fourth turns on the determination of the Director of the Bureau of Prisons that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the" three prior circumstances.   The Government understands that the sentencing guidelines are advisory but the application note to § 1B1.13 certainly offers helpful guidance in determining what constitutes extraordinary and compelling medical circumstances.   *See United States v. Almontes*, No. 3:05CR58 (SRU), 2020 WL 1812713, at *3 (D. Conn. Apr. 9, 2020).

   Here, the Government respectfully submits that (1) the defendant must first exhaust his

administrative remedies before seeking relief from this Court, which he has not done; and (2)

the defendant has not met the high bar of establishing "extraordinary and compelling" reasons

warranting his release.

### III. Exhaustion of Administrative Remedies

A defendant may bring a motion under 18 U.S.C. § 3582(c) only "after [he] has full

fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a

motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by

the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A)(i).   The

Third Circuit recently confirmed that where 30 days have not passed following presentation of a

request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release

at this point." *United States v. Raia*, ___ F.3d___, 2020 WL 1647922, at *2 (3d Cir. Apr. 2,

2020).   This Court reached a similar result recently in *United States v. Gileno*, No. 3:19CR161

(VAB), 2020 WL 1307108, *3 (D. Conn. Mar. 19, 2020) (finding that "[a]s a threshold matter,

Mr. Gileno has not satisfied the requirement under 18 U.S.C. § 3582(c)(1)(A) to first request

that the Bureau of Prisons file a motion on his behalf and then show that thirty days have passed

without any BOP action [and], as a result, the Court cannot consider his motion to modify his

sentence.").   There is no "futility" exception, as the Supreme Court has made clear that courts

have no authority to create an exception to a statutory exhaustion requirement.   *See Booth v.*

*Churner*, 532 U.S. 731, 741 n.6 (2001) (we should "not read futility or other exceptions into

statutory exhaustion requirements where Congress has provided otherwise); *Ross v. Blake*, 136

S. Ct. 1850 (2016) (rejecting a "special circumstances" exception to the exhaustion requirement

stated in the Prison Litigation Reform Act of 1995).1

In short, the exhaustion requirement is mandatory and defendant has not met that requirement here.   The Government recognizes that defendant's counsel has submitted a letter dated April 20, 2020, to the Warden at FCI Danbury requesting compassionate release.   Even if the Court deemed this letter sufficient, the required thirty days has yet to elapse.   Defendant also claims that he emailed the Warden at FCI Danbury on April 10 and April 12 and that the Warden denied his request on April 23.   The defendant has not produced any of these documents or filed them with the Court.   Further, and more importantly, this is not what the federal regulations contemplate for exhaustion in this context.   In order to fully exhaust his administrative remedies, the defendant must receive a denial from either the General Counsel or Director of the Bureau of Prisons. 28 C.F.R. § 571.63(d).   The Administrative Remedy Procedure is set forth in 28 C.F.R. part 542, subpart B, and instructs the inmate to file a Request for Administrative Remedy, Form BP-9 for review of the initial decision at the institution level within 20 days.   28 C.F.R. § 542.14(a).   If that request is denied, within 20 days, he must then file a Request for Administrative Appeal Remedy, Form BP-10 to submit an appeal to the regional office. 28

---

1   The Second Circuit has not yet determined whether the exhaustion requirement in § 3582(c)(1) is subject to judicial waiver and district courts have divided over the issue. *Compare United States v. McCarthy*, No. 3:17CR230 (JCH), 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020)(citing *Washington v. Barr* and concluding court may waive § 3582(c)(1)(A)'s exhaustion requirement); and *United States v. Colvin*, No. 3:19CR179(JBA), 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (same) with *United States v. Gross*, No. 15-CR-769 (AJN), 2020 WL 1862251, at *1 (S.D.N.Y. Apr. 14, 2020) ("§ 3582(c)(1)(A)'s exhaustion requirement cannot be waived by this Court"); *United States v. Roberts*, No. 18-CR-528(JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020) (citing *Ross v. Blake* and concluding that the court may not disregard §3582(c)'s express statutory exhaustion requirement); and *United States v. Smith*, No. 3:16CR48 (MPS), 2020 WL 1903160 *3 (finding *United States v. Roberts* persuasive and that the exhaustion requirement is mandatory and not subject to futility or other judge-made exceptions).

C.F.R. § 542.15(a). Thereafter, if the request is denied, the final step is an appeal within 30 days

to the central office by way of Form BP-11. Id.   Again, only after the request has been denied

by either the General Counsel or Director by way of an appeal to the central office will the

defendant have exhausted all of his administrative remedies.   28 C.F.R. § 571.63(d).

      The administrative review requirement serves an important function.   While Congress

indisputably acted in the First Step Act to expand the availability of compassionate release, it

expressly imposed on inmates the requirement of initial resort to administrative remedies and

for good reason.   The Bureau of Prisons conducts an extensive assessment for such requests.

*See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate

Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A)

and 4205(g), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.   As the

Procedures reflect, the Bureau of Prisons completes a diligent and thorough review, with

considerable expertise concerning both the inmate and the conditions of confinement.   Its

assessment will always be of value to the parties and the Court.   *See United States v. Rivera*,

3:17CR159 (VLB), 2020 W.L. 1909227 at *3 (D. Conn., April 10, 2020)("the BOP is usually

in the best position to evaluate the scope of an inmate's medical condition, the adequacy of

release plan, and any danger posed to the community if they are released.").

      This remains true in the present public health crisis.   The government does not

minimize the defendant's concerns in any way and is aware of the dangers that COVID-19

poses.   BOP has accordingly taken significant measures in an effort to protect the health of

the inmates in its charge.   BOP began planning for potential coronavirus transmissions in

January 2020. At that time, the agency established a working group to develop policies in

consultation with subject matter experts in the Centers for Disease Control (CDC), including

by reviewing guidance from the World Health Organization (WHO).   On March 13, 2010,

BOP announced that it was implementing the Coronavirus (COVID 19) Phase Two Action

Plan ("Action Plan") in order to minimize the risk of coronavirus transmission into and

inside its facilities.   The Action Plan has undergone modifications since.   In total, the BOP

Action Plan comprises many preventive and mitigation measures, including the following:

all incoming inmates are screened, and staff are regularly screened; contractor visits are

limited to essential services, while nearly all attorney, social, and volunteer visits have been

suspended; inmate movements between facilities have been extremely limited; and

institutions are taking additional steps to modify operations to maximize social distancing.

BOP has taken further steps as events require, including confining all inmates to their living

quarters for a 14-day period beginning on April 1, 2020, in order to mitigate any spread of

the disease. Many additional details are available at the BOP website, www.bop.gov.

     There are many challenging factors to consider during this unprecedented pandemic

and BOP should have the opportunity to assess those factors during the statutorily required

review period.   For example, notwithstanding the current pandemic crisis, BOP must carry

out its charge to incarcerate sentenced criminals to protect the public.   It must consider the

effect of release on the safety and health of both the inmate population and the citizenry.   It

must marshal its resources to care for inmates in the most efficient and beneficial manner

possible.   It must assess release plans, which are essential to ensure that a defendant has a safe

place to live and access to health care in these difficult times.

     For all of these reasons, BOP is best positioned to determine the proper treatment of

the inmate population as a whole, taking into account both individual considerations based on an inmate's background and medical history, and more general considerations regarding the conditions and needs at particular facilities. The provision of § 3582(c)(1)(A) prioritizing administrative review therefore makes sense not just in the ordinary case, but also under these exceptional circumstances. As the Third Circuit stated, "[g]iven BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 2020 WL 1647922, at *2. Thus, it would be prudent to give BOP the opportunity to engage in a meaningful administrative review of the defendant's case, which may not have occurred here.

## IV. Defendant Has Not Established Extraordinary and Compelling Reasons

This Court may only reduce a sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) if, "after considering the factors set forth in section 3553(a), to the extent that they are applicable," the Court finds that "extraordinary and compelling reasons warrant such a reduction" and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The defendant bears the burden of establishing that he is entitled to a sentence reduction, *see United States v. Ebbers,* No. S402CR11443VEC, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020), and to show special circumstances for compassionate release to be granted. *See United States v. Greenhut,* 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (citing *United States v. Sprague,* 135 F.3d 1301, 1306-07 (9th Cir. 1998)). As district courts addressing these claims have noted: "To be faithful to the statutory language requiring 'extraordinary and compelling reasons,' it is not enough that Defendant suffers from . . . chronic conditions that [he] is not expected to recover from. Chronic conditions that can be

13

managed in prison are not a sufficient basis for compassionate release." *United States v. Ayon-Nunez,* 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020) (rejecting a claim for compassionate release from a defendant suffering from severe back injuries and epilepsy) (quoting *United States v. Weidenhamer,* 2019 WL 6050264, at *5 (D. Ariz. Nov. 8, 2019)).

Here, the defendant states that he suffers from back problems stemming from a disc herniation, obesity, psoriasis, obstructive sleep apnea and generalized anxiety disorder, all of which in totality place him at heightened risk of serious illness from COVID-19 and that this totality of medical conditions constitutes an extraordinary and compelling reason to warrant his release.   While the government does not downplay these conditions, the government disagrees that any of those conditions, individually or in sum, rise to the level required for compassionate release.   As a preliminary matter, there is a lack of medical documentation supporting the defendant's claims, particularly as to the current nature of his various medical conditions and any BOP treatment for those conditions. As to defendant's claim of obesity, the government notes the PSR completed on April 15, 2019, indicated that defendant weighed 290 pounds.   However, defense counsel has informed the government that the defendant's BOP intake photograph listed him at 230 pounds.   This is obviously a significant discrepancy to the claim in the motion for release that defendant currently weighs over 300 pounds and only underscores the need for some evidentiary foundation for the claimed conditions.

Further, the Probation Office documented defendant's sleep apnea, anxiety disorder and back issues in the defendant's Pre-Sentence Report, those conditions appear to have existed at the time of the original sentencing and there is no indication that there has been any material decline in these conditions since the defendant has been in BOP.   Although the nature of any

14

treatment BOP is providing the defendant is not known, there is no evidence that the defendant falls into the category of inmates who are "suffering from a serious physical or medical condition . . . that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, application note 1(A).   Indeed, the limited information we have suggests that the defendant retains the ability to seek and obtain treatment and medication within the health care system at the BOP, because he has, in fact, done so.   He has not shown that his medical issues, which remain largely the same as when he was sentenced, qualify as the type of "extremely serious, if not life-threatening" conditions for which compassionate release is traditionally available under Section 3582(c)(1)(A)(i).   *See Gileno*, 2020 WL 1307108, at *3 (collecting cases). *See, e.g., United States v. Ebbers,* No. 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *5 (S.D.N.Y. Jan. 8, 2020) ("The Medical Condition Note ... highlights 'terminal illness' and 'serious conditions and impairments,' including 'advanced dementia' and other diseases associated with an 'end of life trajectory.'"); *United States v. Beck*, No. 1:13-cr-186-6, 2019 WL 2716505, at *12 (M.D.N.C. June 28, 2019) (granting compassionate release for 47 year-old defendant who had cancer that was not timely treated); *United States v. Gray*, 416 F. Supp. 3d 784, 791 (S.D. Ind. 2019) (granting compassionate release to 64-year old defendant who had been hospitalized for multiple procedures, including one for a liver tumor); *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (granting compassionate release where defendant was wheelchair bound, blind, required 24/7 care, and was given a prognosis of 18 months to live); *cf. United States v. Rivernider,* No. 3:10-cr-222 (RNC), 2020 WL 597393, at *5 (D. Conn. Feb. 7, 2020) (finding that the defendant's "heart condition is not nearly as

15

grave as the medical conditions that have been found to justify compassionate release in other cases," noting that the defendant has not demonstrated that his heart condition 'substantially diminishes [his] ability... to provide self-care' "); *United States v. Smith*, No. 3:16CR48 (MPS), 2020 WL 1903160 (D. Conn., April 17, 2020)(rejecting compassionate release where defendant's conditions had not declined materially since sentencing and defendant had failed to show BOP could not manage his conditions, and noting that that the fact the defendant had conditions that placed him at higher risk for severe illness from contracting the virus was not dispositive).

In essence, the defendant argues that his medical conditions alone are enough for his release because he is at risk of serious complications if he becomes infected with COVID-19 while at FCI Danbury.   However, the defendant has not demonstrated that the BOP is not equipped to provide appropriate medical treatment if he were to become sick.   Indeed, the defendant has failed to show how the plan being implemented by the BOP is inadequate to manage the COVID-19 pandemic within his correctional facility, or that the facility is specifically unable to treat him.

BOP has aggressively addressed the concern that COVID-19 will place *any* of its inmates or staff at risk.   This has included directives from the BOP medical director to all field clinical personnel as early as January 31, 2020 and February 29, 2020—far earlier than many state and municipalities—with inmate and staff screening tools and best practices to prevent the spread of COVID-19.   On April 1, 2020, the BOP initiated a Coronavirus (COVID-19) Phase Five Action Plan ("Action Plan") to follow prior Phases 1 through 4 in order to minimize the risk of COVID-19 transmission into and inside its facilities. BOP

16

maintains a COVID-19 resource web page: https://www.bop.gov/coronavirus/index.jsp, with detail regarding its ongoing efforts, which also includes reference to the Action Plan.   *See* https://www.bop.gov/coronavirus/covid19_status.jsp and https://www.bop.gov/resources/news/20200313_covid-19.jsp.

Among the many preventative and mitigating measures adopted by the BOP in its various phases are:

- **Screening of Inmates and Staff**: All new BOP inmates are screened for COVID-19 symptoms and risk of exposure. Asymptomatic inmates with a documented risk of exposure will be quarantined; symptomatic inmates with a documented risk of exposure will be isolated and tested pursuant to local health authority protocols. In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures. (Staff registering a temperature of 100.4 degrees F or higher will be barred from the facility on that basis alone.)

- **Limitations on Contractors**: Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened using the same procedures as applied to staff prior to entry.

- **Quarantine Logistics**: The Action Plan directs all BOP institutions to assess their stockpiles of food, medicines, and sanitation supplies and to establish quarantine areas within their facilities to house any detainees who are found to be infected with or at heightened risk of being infected with coronavirus pursuant to the above-described screening protocol.

- **Suspension of Social Visits and Tours**: BOP has suspended all social visits, such as visits from friends and family, to limit the number of people entering the facility and interacting with detainees, *including at FCI Danbury*.   In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended for at least the first 30 days that the Action Plan is in effect.

- **Suspension of Staff Travel**: All staff training, other than for new hires, and official staff travel other than for relocation, is suspended.

- **Suspension of Legal Visits**: BOP has also placed a 30-day hold on legal visits, though such visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

- **Suspension of Inmate Movements**: BOP has also largely ceased the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, and to avoid overcrowding, this will prevent transmissions between institutional populations. Where inmates must be moved, careful screening will be employed and all movement will be monitored through the BOP Emergency Operations Center.

- **Modified Operations**: Finally, the Action Plan requires wardens at BOP facilities to modify operations in order to maximize social distancing. Among the actions are staggering of meal times and recreation time.

In Phase 5, effective as of April 1, 2020, BOP is taking the following actions immediately to further mitigate the exposure and spread of COVID-19:

- For a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus. This modification to our action plan is based on health concerns, not disruptive inmate behavior.   At this time, inmate interval movement has largely been suspended with limited exceptions.    There are specific criteria that must be met for the exceptions to apply.

- During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

- In addition, the Bureau is coordinating with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.

- Limited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access.

It should also be noted, as reflected on the BOP website, that the BOP has substantial experience dealing with protocols for infectious diseases to limit outbreaks at BOP facilities. The above information also makes clear that the BOP recognizes the unique threat posed by

the transmission of viruses inside its facilities, and longstanding policies and procedures are already in place to reduce the risk of an outbreak of many serious diseases, such as HIV/AIDS, MRSA, sexually transmitted diseases, viral hepatitis, tuberculosis, and seasonal influenza. BOP plainly recognizes that COVID-19 carries an increased risk of transmission; that COVID-19 carries a higher fatality rate than many other viruses; and that the COVID-19 situation has resulted in a state of emergency.   However, as noted above, BOP has instituted more aggressive measures to address these heightened circumstances.   Lastly, any inmate that tests positive or shows symptoms is moved to isolation and, if necessary, to a local hospital if conditions cannot be managed by in-house medical staff.   In short, defendant cannot demonstrate that his conditions cannot be adequately managed by BOP.

While it is certainly true that BOP—like nearly every community— is affected by the spread of COVID-19, it does not follow that inmates are necessarily at greater risk than members of the general public.   BOP has implemented significant protective measures and, through increased use of home confinement and continued evaluation of compassionate release, is actively seeking to remove the most vulnerable *and* least dangerous to safer alternative settings.2

---

2 On March 27, 2020, the president signed the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act"). Before the CARES Act was passed, § 3624(c)(2) provided the BOP with the exclusive authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting BOP to expand the use home confinement under § 3624(c)(2). Section 12003(b)(2) suspends, during the emergency of the coronavirus pandemic, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, once the Attorney General makes requisite finding that emergency conditions will materially affect the function of BOP.[2] (authorizing the BOP to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of

Given that no persons will be admitted to BOP facilities without being screened for symptoms and risk of infection and even asymptomatic inmates with risk factors are being quarantined, the risk that Defendant himself will be infected simply because of his incarceration is not necessarily higher than his risk of infection upon release. There is ample evidence of widespread COVID-19 transmission and clustering outside of BOP.   However, the ability to test, control, and isolate in BOP custody appear to be the best approach to limiting the transmission.   On the record before this Court, there is no evidence that BOP custody in general or custody at FCI Danbury in particular puts defendant in some meaningfully greater risk of contracting COVID-19 as compared to the general population in the United States.3

We are in the midst of a national crisis requiring extraordinary measures. Nonetheless, § 3582 covers compassionate release, not widespread prophylactic release and modification of lawfully-imposed sentences of defendants whose conditions can be treated by BOP.   In

---

section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate.").

On March 26, 2020, the Attorney General issued a Memorandum directing the BOP to "prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19." https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf. As a result of the CARES Act and the AG's directive, to date, BOP has placed an additional 1,576 inmates on home confinement (*see* https://www.bop.gov/coronavirus/index.jsp).   BOP has described its increased use of home confinement on its website: https://www.bop.gov/resources/news/20200405_COVID19_home_confinement.jsp   ("Case management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General.

3  It should be noted that a review of the BOP website at the time of filing of the defendant's motion on April 22, 2020, indicated that there have been 5 inmates at FCI Danbury who tested positive for the virus.   That number remains the same as of the filing of the government's memorandum on April 28, 2020.

conclusion, defendant does not claim to be infected with COVID-19, or that he was denied

necessary medical treatment or care for exposure to COVID-19.   Nor can Defendant establish

that should he contract COVID-19 while in custody, the facility would be unable to administer

constitutionally acceptable treatment.

### V. The 3553(a) Sentencing Factors

Lastly, the Court must also consider the factors enumerated in 18 U.S.C. § 3553(a) in

its analysis of whether there exist extraordinary and compelling reasons to reduce the

defendant's sentence to time served.   *See United States v. Smith*, 3:16CR48 (MPS), 2020 WL

1903160 at *4 (D. Conn., April 17, 2020).   The Section 3553(a) factors include the following:

(1) "the nature and circumstances of the offense and the history and characteristics of the

defendant;" (2) "the need for the sentence imposed" to serve the purposes of sentencing,

including punishment (i.e., the need to reflect the seriousness of the offense, promote respect

for the law, and afford just punishment), deterrence, protection of the public, and rehabilitation;

(3) the Sentencing Guidelines, and (4) "the need to avoid unwarranted sentence disparities

among defendants with similar records who have been found guilty of similar conduct." These

factors weigh heavily against release in this matter.

First, the defendant engaged in a serious drug trafficking offense at a substantial scale.

He established a pipeline for kilogram quantities of cocaine to flow into greater Waterbury

from Puerto Rico over a lengthy period.   He was the driving force and point man in

Waterbury for this distribution scheme on behalf of the Puerto Rico-based drug trafficking

organization.   The fact that, at various moments in time, law enforcement seized multiple

kilograms of cocaine and also on one occasion seized an outbound parcel of $100,000 in cash

underscores the scope of the defendant's drug trafficking enterprise.   Moreover, as the Court

knows, narcotics crimes are not victimless. Drug trafficking has a broad array of victims, from

the individuals who become addicted, to families that are destroyed, to the erosion of

educational and economic opportunities and the decay of whole neighborhoods.   In short, the

nature of the offense demands punishment that reflects it seriousness, just punishment in light of

the scale of the offense, and promotes respect for the law.   A reduction of sentence to time served

(approximately 29 months) does not adequately serves these purposes.

Further, a reduction to time served does not take into account the defendant's criminal

history, the substantial risk of recidivism that he poses, the need for general and specific

deterrence and the protection of the public from further crimes of the defendant.   At the age of 35

years old, the defendant has amassed a significant criminal history for drug trafficking offenses.

In January 2007, the defendant was convicted of sale of narcotics and received a sentence of 8

years suspended after 3 years to serve and 5 years' probation.   The defendant was discharged

from custody in November 2009 and began his probationary term.   In September 2010, less than

a year later, he was arrested on a drug possession charge, was convicted in November 2010 and

paid a $4,000 fine.   Within a month of that conviction, in December 2010, he was again arrested

on a charge of possession with intent to sell narcotics.   He was convicted of this charge in July,

2011, and sentenced to 10 years' imprisonment.   He was paroled in June 2015 and was on parole

at the time he commenced the cocaine by mail distribution scheme at issue in this matter, which

seems to represent a substantial escalation in his criminal conduct.   In short, over the past 13

years, the defendant has either been in jail, on probation or parole or had a pending criminal

matter.   He has spent a significant period incarcerated by the State of Connecticut.   This did

nothing to deter him from offense conduct in this federal matter.   He committed a large-scale federal drug trafficking offense while on parole, knowing fully well that the consequence would be another lengthy spell of imprisonment.

Not only does the defendant pose a significant risk of re-offending if he were to be released, but also the conditions are certainly ripe for him to do so.   While the defendant and his compatriots operating in Waterbury were arrested, the Puerto Rico-based source of supply and the associated organization remain intact.   If the defendant were to be released, he could very easily resume his drug trafficking operation if he were so inclined.   Nothing in his history suggests that he would not if the opportunity presents itself.   Home confinement does not lessen this risk. Cell phones, encrypted applications and other computer-based applications could permit the defendant to easily operate from within the confines of his home and through proxies without any meaningful way for the United States Probation Office to police such misconduct.   As the Second Circuit recognized in *United States v. Orena*, a case that addressed whether a defendant's proposed conditions in a pretrial release context would reasonably assure the safety of the community, "electronic surveillance systems can be circumvented by the wonders of science and sophisticated electronic technology and monitoring equipment can be rendered inoperative."   986 F.2d 628, 632 (2d Cir. 2003)(internal quotations omitted).   The probation office cannot possibly police whether defendant utilizes a cell phone provided by associates to continue drug business even in an ordinary environment, much less during the environment created by the current health crisis.   In short, the Court would be left to rely upon the defendant's assurance that he will not return to drug trafficking no matter his financial predicament, an assurance that is suspect given his history.   *See Orena*, 986 F.2d at 633.

23

The temptation and risk that the defendant will address any financial distress, particularly where there do not appear to be employment prospects for him, through drug-related activity is too great.   Accordingly, a reduction of his 120-month sentence to time served does not adequately provide specific deterrence to this defendant, would send a poor message regarding general deterrence and does not adequately protect the public from the risk of further crimes of this defendant.

Finally, any such reduction and release creates a substantial sentencing disparity with other similarly situated defendants who have committed similar crimes.   Defendants in this district routinely serve mandatory minimum sentences of 10 years' imprisonment for offenses involving in excess of 5 kilograms of cocaine.   The defendant here has served roughly only 29 months of his 120 months' imprisonment.   Giving him time served in light of the scope of his offense, his criminal history, BOP's ability to manage his medical conditions even in current circumstances and the fact that those conditions are not typically "extraordinary and compelling" would create an unwarranted disparity.

## VI. The Furlough Request

If the Court denies his request for time served or a reduction to home confinement for the remainder of his term, the defendant seeks a furlough for the duration of the crisis.   The Court does not have the authority to grant such a request.   Congress placed discretion to grant a furlough with the BOP, not the courts.   *See* 18 U.S.C. § 3622(a); *see also*, *United States v. Hernandez*, No. 19 CR. 834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *see also*, *United States v. Underwood*, No. CR TDC-18-0201-1, 2020 WL 1529160, at *3 (D. Md. Mar. 31, 2020).

24

**VII. Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court deny the

defendant's motion for compassionate release, or alternatively, for a temporary furlough.


Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

*/s/ S. Dave Vatti*
S. DAVE VATTI
ASSISTANT U.S. ATTORNEY
FEDERAL BAR NO. CT 11957
450 MAIN STREET, SUITE 328
HARTFORD, CT 06103
860-947-1101

<u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on April 28, 2020, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.    Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.    Parties may access this filing through the Court's CM/ECF System.

*/s/ S. Dave Vatti*
_____
S. DAVE VATTI
ASSISTANT U.S. ATTORNEY

26